IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTON MIKHAILOVICH GAVENKO, | ) ) ) | |
| Petitioner, | ) ) ) | Civil Action No. 3:25-cv-57 |
| v. | ) ) | |
| LEONARD ODDO, *in his official capacity as Warden of Moshannon Valley Processing Center*, et al., | ) ) ) ) | District Judge Stephanie L. Haines |
| Respondents. | ) ) | Magistrate Judge Peter E. Ormsby |

**REPORT AND RECOMMENDATION**

## I.    Recommendation

Before the Court is Petitioner Anton Mikhailovich Gavenko's Petition for Writ of Habeas Corpus (ECF No. 1), filed with the assistance of counsel. Petitioner is a Russian citizen who is in the custody of U.S. Immigration and Customs Enforcement (ICE) pending his removal to Russia. The issue in this case is whether his lengthy detention violates 8 U.S.C. § 1231(a)(6), as interpreted by the Supreme Court *Zadvydas v. Davis*, 533 U.S. 678 (2001). For the reasons explained below, it is respectfully recommended that the Petition for Writ of Habeas Corpus be granted and that Petitioner be released from custody, subject to appropriate conditions in accordance with 8 U.S.C. § 1231(a)(3).

## II.    Report

### A. Background

Petitioner was born in 1989 in Surgut, Siberia, which at the time was part of the Soviet Union. ECF No. 1, Ex. A. In 1995, when Petitioner was five years old, he and his mother came to the United States and were admitted as Jewish refugees. *Id.* at ¶¶1, 14; Ex. D, E. Years later,

1

Petitioner was granted lawful permanent resident status on August 24, 2012, and his mother became a citizen in 2015. *Id.* at ¶15; Ex. E. He has not traveled outside the United States since coming here in 1995. *Id.* at ¶14.

After living in the United States for over 25 years, Petitioner pled guilty to a felony arson charge on June 30, 2023, in a New Jersey court. *Id.* at ¶16; ECF No. 6 at 3. According to Petitioner, he had set fire to his own possessions inside his apartment during a bout of depression and substance abuse. *Id.* at ¶16; Ex. A. The court sentenced him to five years' imprisonment, of which he served 14 months. Upon his release from prison, he was transferred to ICE custody and served with a Notice to Appear in February 2024. *Id.*; Ex. J. He has remained in immigration detention ever since.

An immigration judge issued a removal order on May 7, 2024. *Id.* at Ex. B. Petitioner waived appeal, and thus the removal order became final. About two months later, on July 10, 2024, Petitioner was informed that ICE was working to obtain a travel document and that "[a] travel document from the Government of Russia is expected." *Id.* at Ex. C. The accompanying instruction sheet stated, "[a]t this time, ICE has sufficient identity documents …." *Id.* About two weeks after that notice, on July 22, 2024, a Decision to Continue Detention was issued, stating, in part, that "ICE *received the necessary travel documents* to effectuate [his] removal, and removal is practicable, likely to occur in the reasonably foreseeable future, and in the public interest." *Id*. (emphasis added). Thus, by July 2024, ICE claimed to have the necessary identity and travel documents to remove Petitioner to Russia.

About three months later, by a Decision to Continue Detention dated November 7, 2024, ICE again elected to continue detention, stating:

> ICE is *currently working* with the government of Russia *to secure a travel document* for your removal from the United States. A travel document from the

2

> Government of Russia is expected, and ICE has reason to believe there's a significant likelihood that your removal will occur in the reasonably foreseeable future, therefore, you are to remain in ICE custody at this time, as ICE is unable to conclude that the factors set forth at 8 C.F.R. § 241.4(e) have been satisfied.

*Id.* (emphases added). As can be seen, ICE reported as of November 2024 that it "expected" a travel document from Russia. It is unclear what happened to the travel document, if any, that ICE purportedly had received in July.

Also dated November 7, 2024, a Post-Order Custody Review (POCR) checklist stated as follows:[1]

> On July 25, 2024, a travel document request was delivered to the Embassy of Russia, in Washington D.C. On September 10, 2024, the Russian Embassy requested an update regarding the status of the travel document issuance. On October 2, 2024, the Russian Embassy stated GAVENKO's citizenship confirmation is pending from Russia officials. Currently, pending the issuance of a travel document is pending from the Russian officials to confirm GAVENKO's citizenship.

*Id*. As shown by this report, ICE learned in October 2024 that the Russian Embassy was attempting to confirm Petitioner's Russian citizenship.

Petitioner cooperated in that effort, filing a petition with the Russian Consulate on November 20, 2024, to confirm his Russian citizenship. ECF No. 1, ¶20; Ex. K. The consulate initially responded with a letter stating they were verifying "whether or not there is Russian Federation Citizenship." *Id.* at Ex. K. But since then, Petitioner has heard nothing from the consulate despite numerous phone calls to check on the status of his citizenship petition.

On February 13, 2025, ICE issued another Decision to Continue Detention, stating that it had reason to believe there was a significant likelihood of Petitioner's removal in the "near future." *Id.* at Ex. L. The related POCR checklist stated that the travel document request had been sent to consular officials on July 25, 2024, and that "[a]s of January 24, 2025, consular

---

[1] The POCR checklist form is entitled "HQ POCR Checklist for 241.13 Reviews."

3

officials maintain the verification of citizenship remains pending the officials in Moscow." *Id.*

ICE was thus aware that as of January 2025,  Russian officials had still not verified Petitioner's

Russian citizenship. Since February 2025 Respondents have provided no additional updates.

Petitioner, however, has submitted a very recent update from the Russian Consulate. By

letter dated April 9, 2026, the Consulate General of the Russian Federation advised that they will

not issue travel documents for Petitioner, due to inability to confirm his Russian citizenship. ECF

No. 9, Ex. A. As of May 26, 2026, the ICE detainee locator shows that Petitioner remains

detained at Moshannon Valley Processing Center.

Petitioner filed this action seeking federal habeas relief. ECF No. 1. His principal claim is

that his "continued detention violates 8 U.S.C. § 1231(a)(6), as interpreted by the Supreme Court

in *Zadvydas v. Davis*, 533 U.S. 678 (2001)." [2] *Id*. at ¶ 2. Respondents agree that the analysis in

*Zadvydas* controls Petitioner's challenge to his § 1231(a)(6) detention. ECF No. 2 at 6-7.

### B.  Analysis

A federal court is authorized to grant a writ of habeas corpus to a person held in custody

"in violation of the Constitution or laws or treaties of the United States[.]" 28 U.S.C. §

2241(c)(3). As the Supreme Court recognized in *Zadvydas*, "§ 2241 habeas corpus proceedings

remain available as a forum for statutory and constitutional challenges to post-removal-period

detention," which is the type of challenge Petitioner asserts here. *Zadvydas*, 533 U.S. at 688; *see*

*also Van Bo v. Bondi*, No. CV 3:26-28, 2026 WL 891601, at *2 (W.D. Pa. Apr. 1, 2026) (noting

§ 2241confers jurisdiction over a challenge to § 1231 post-removal-order detention).

---

[2] Although the Petition also references the Administrative Procedures Act (APA), Petitioner states in his reply brief that he "only asks for relief pursuant to *Zadvydas* and not the Administrative Procedure Act or the Due Process Clause." ECF 7 at 8 n.2. As such, his APA argument need not be addressed.

1. <u>Post-Removal-Order Detention</u>

The Government's authority to detain a noncitizen after entry of a removal order is governed by 8 U.S.C. § 1231. The parties agree Petitioner is being detained under § 1231(a)(6). ECF No. 1 at ¶¶22-24; ECF No. 6 at 6. Section 1231(a) provides, in pertinent part:

> [(1)(A)] Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period").
> . . .
>
> [(2)(A)] During the removal period, the Attorney General shall detain the alien. Under no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible under section 1182(a)(2) or 1182(a)(3)(B) of this title or deportable under section 1227(a)(2) or 1227(a)(4)(B) of this title.
> . . .
>
> [(6)] An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

The statute thus calls for an initial 90-day removal period during which an alien must be detained. 8 U.S.C. § 1231(a)(2)(A). After that, the Government may continue to detain certain aliens under § 1231(a)(6) pending their removal. In *Zadvydas,* the Supreme Court considered how long an alien may be detained under § 1231(a)(6) while awaiting removal. The Court found that interpreting § 1231(a) to allow indefinite detention would raise "a serious constitutional threat." *Zadvydas*, 533 U.S. at 699. To avoid that result, the Court interpreted § 1231(a)(6) to limit post-removal-order detention to a period "reasonably necessary to bring about that alien's removal from the United States." *Id*. at 689. "[O]nce removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id*.

5

To aid courts in addressing challenges to post-removal-order detention, *Zadvydas* recognized that six months' detention is "presumptively reasonable." *Id.* at 701. After that, a noncitizen may challenge continued detention under § 1231(a)(6) by showing "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* If that showing is made, the burden shifts to the Government to adduce evidence in rebuttal. *Id.* The strength of the Government's rebuttal evidence must increase as the length of detention increases. *See Roe v. Oddo*, No. 3:25-CV-128, 2025 WL 3030692, at *7 (W.D. Pa. Oct. 30, 2025) (noting "there is an inverse relationship between the time the alien has been detained post-removal and the showing the Government must make in rebuttal") (citing *Zadvydas*, 533 U.S. at 701). Put another way, "for detention to remain reasonable, as the period of prior post-removal confinement grows, what counts as the 'the reasonably foreseeable future' conversely [] ha[s] to shrink." *Zadvydas*, 533 U.S. at 701.

### 2. *Zadvydas* Burden-Shifting Analysis

#### a. *Petitioner's Showing of "Good Reason"*

Applying this burden-shifting framework here, we start with Petitioner's showing of "good reason" to believe there is no significant likelihood he will be removed to Russia in the reasonably foreseeable future. *See Joseph v. United States*, 127 F. App'x 79, 81 (3d Cir. 2005) (stating that "[u]nder *Zadvydas*, a petitioner must provide 'good reason' to believe there is no likelihood of removal") (quoting *Zadvydas*, 533 U.S. at 701). In considering that showing, we must bear in mind that as of this writing, Petitioner has been detained under § 1231 for 24 months—which is obviously far beyond the presumptively reasonable six-month period.[3]

---

[3] Petitioner asserts that the six-month period expired on November 9, 2024. ECF No. 1 at 9. Respondents acknowledge that as of July 18, 2025, Petitioner had been subject to a final order of removal for approximately 14 months. ECF No. 6 at 4.

In filing his Petition, Petitioner offered the following description of his "good reason" for believing his removal is no longer reasonably foreseeable:

> The reason is simple: While the Government has stated that an issuance of a travel document is imminent, it is still pending after nine months. The Russian consulate has provided no updates or indications that it will be issued soon and has not made any statements in the past three months.

ECF 1, ¶ 31.

Respondents counter that Petitioner has not met his initial burden because "mere passage of time is not enough to show removal is not reasonably foreseeable." ECF No. 6 at 7. To prove that point, Respondents cite cases for the proposition that "mere passage of time absent any 'facts suggesting a particular barrier to removal' is insufficient to meet a habeas petitioner's burden." *Id*. at 8 (quoting *Miller v. Hendricks*, No. 10-5679, 2010 WL 4923938, at *3 (D.N.J. Nov. 24, 2010)).

Respondents are correct that some courts have found that the mere passage of time, without more, is insufficient. *See, e.g., Gholestani v. United States Dist. Ct.*, No. CIV-25-1392-R, 2026 WL 596649, at *2 (W.D. Okla. Mar. 3, 2026) (stating that "the mere fact of some delay will not require the release of the alien") (quoting *Fahim v. Ashcroft*, 227 F. Supp. 2d 1359, 1367 (N.D. Ga. 2002)); *Beckford v. Lynch*, 168 F. Supp. 3d 533, 539–40 (W.D.N.Y. 2016) (noting "several cases decided within this district have found the habeas petitioner's assertion as to the unforeseeability of removal, supported only by the mere passage of time, insufficient to meet the petitioner's initial burden"; citing cases). For these courts, in addition to the passage of time, a noncitizen detainee must also "demonstrate that the circumstances of his status, or the existence of particular individual barriers to his repatriation to his country of origin are such that there is no significant likelihood of removal in the reasonably foreseeable future." *Duong v. Tate*, No. CV H-24-4119, 2025 WL 933947, at *3 (S.D. Tex. Mar. 27, 2025) (quoting *Idowu v. Ridge*,

No. 3:03-CV-1293-R, 2003 WL 21805198, at *4 (N.D. Tex. Aug. 4, 2003) (internal quotes and citation omitted)).

But not all courts agree with the approach taken in those cases regarding the significance of the passage of time. *See Wray v. Mukasey*, No. CIV.A. 08-6042WJM, 2009 WL 1834318, at *5 (D.N.J. June 26, 2009) (noting that "[f]ederal courts disagree as to the extent to which the passage of time can suffice to meet the alien's burden"; citing cases).[4] Petitioner's Reply Brief discusses cases in which the court's analysis reflects that the passage of time was a key factor. ECF No. 7 at 2-5. For example, Petitioner points to courts that have found no significant likelihood of removal "where there was no definitive answer from the target country after several months as to whether it would issue travel papers for a detainee." *Id.* at 3 (quoting *Nma v. Ridge*, 286 F. Supp. 469, 475 (E.D. Pa. 2003)).

Both parties discuss the Third Circuit's ruling in *Joseph v. United States*, 127 F. App'x 79, 81 (3d Cir. 2005). In that case, the Department of Homeland Security (DHS) ordered the petitioner (who goes by the name Joseph Alva) removed to Antigua-Barbuda. 127 F. App'x at 80 & n. 1. After spending almost 11 months in post-removal-order detention, Alva filed a habeas corpus petition in January 2004, arguing that his detention had been excessively long and invoking *Zadvydas*. *Id*. The district court denied habeas relief, concluding that "Alva did not meet his burden of showing 'good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future.'" *Id*. (quoting *Zadvydas*, 533 U.S. at 701). Reviewing that decision, the Third Circuit noted that "Alva submitted no evidence that removal

---

[4] *See also Khalid v. Noem*, 2026 WL 196631 at *6 (W.D.Okla. Jan. 26, 2026) (observing that "district courts across the country have utilized an array of approaches in deciding when continued post-removal-period detention of an immigrant becomes unconstitutional and reached varying conclusions" on issues such as "whether the mere passage of time is sufficient").

would not occur in the foreseeable future"; in contrast, "DHS submitted evidence that a representative from the Consulate General of Antigua had advised in April 2004 that Alva's travel documents would be forthcoming." *Id*. at 80-81. The consulate official's assurance came a few months after Alva filed his habeas petition and before the district court entered its ruling. The Third Circuit affirmed, agreeing that "Alva has failed to make [the *Zadvydas* 'good reason'] showing." *Id*. at 81.

By the time the Third Circuit entered its decision, Alva had been in post-removal-order detention for over two years. *Id*. Noting Alva's lengthy detention, the Court cautioned that while the record before it was insufficient to conclude that removal was no longer reasonably foreseeable, "at some point in time the inability to procure travel documents may provide 'good reason' to believe that removal is unlikely to be carried out." *Id*. at 82. Thus, even in a case in which a foreign country's consulate assured that travel documents would be provided, the Third Circuit recognized that "at some point" their inability to do so may satisfy a noncitizen's initial burden under *Zadvydas* to show that his or her removal is unlikely in the reasonably foreseeable future.

In the instant case, Petitioner initially relied on the sequence of events during the first nine months of his post-removal-order detention to show good reason to believe that there was no significant likelihood of removal in the reasonably foreseeable future. *See* ECF No. 1, ¶¶ 17-21, 30-31. As summarized earlier, at one point early on (in July 2024) ICE stated, apparently inaccurately, that Petitioner's travel documents had already been received. However, as of November 2024, ICE reported it was working with the Russian government to obtain travel documents and noted that the consulate was still in the process of verifying Petitioner's Russian citizenship. Although ICE stated in November 2024 that it had reason to believe Petitioner would

9

be removed in the "reasonably foreseeable future," (ECF No. 1, Ex. C), there is no indication anyone at the consulate assured ICE that travel documents would be provided.

Three months later, as of February 2025, nothing had changed. No travel papers had been issued, and Russian officials still had not verified Petitioner's citizenship—even though ICE had reported in July 2024 that his identity papers were available. ICE reported it had reason to believe there was a likelihood of Petitioner's removal in the "near future," but again no information about the basis for that conclusion was given. *Id.* at Ex. L.  Despite ICE's assurance, the record shows that no travel documents were thereafter provided.

Apart from the passage of time, the sequence of events outlined above arguably gives rise to doubt that, as of February 2025, Petitioner's removal was likely in the reasonably foreseeable future. That doubt only increases as the months have passed since February 2025—with no travel documents forthcoming. These events also arguably fit one of the scenarios in which courts have found no significant likelihood of removal; specifically, cases "where there was no definitive answer from the target country after several months as to whether it would issue travel papers for a detainee." *Nma*, 286 F. Supp. at 475.[5]

In any event, it is unnecessary to decide whether the "passage of time," together with Russia's inaction, is sufficient to show Petitioner's "good reason" to believe there is no significant likelihood he will be removed to Russia in the reasonably foreseeable future. Any

---

[5] *See also Dupont v. Meserve*, No. 2:25-CV-00593-JAW, 2026 WL 74112, at *4 (D. Me. Jan. 9, 2026) (stating "[c]ourts have considered 'the passage of time combined with' the 'government [being] no closer to ... repatriating [a noncitizen] than they were once they first took him into custody' as sufficient to meet petitioner's 'initial burden'") (citations omitted); *Kacanic v. Elwood*, No. CIV.A. 02-8019, 2002 WL 31520362, at *3 (E.D. Pa. Nov. 8, 2002) (finding  that in the absence of "any definitive answer, or any indication that a definitive answer is likely soon, there is no legitimate reason to believe that removal will occur in the reasonably foreseeable future") (citations omitted).

doubt about whether Petitioner initially met that burden was quashed by the notice from the Russian Consulate dated April 9,2026, which Petitioner recently submitted. ECF No. 9-1, Ex. A. In that notice, the vice consul advised that the consulate was "not in a position to issue a travel document for Mr. Anton Gavenko," noting that he had permanently resided in the United States since 1995 and explaining that Russian authorities had been unable to confirm his Russian citizenship. *Id*. Such evidence satisfies Petitioner's burden regarding the likelihood of his removal in the reasonably foreseeable future.

### b. *Respondents' Rebuttal Evidence*

Because Petitioner has met his burden to show "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the burden shifts to the Respondents to adduce evidence in rebuttal. *Zadvydas*, 533 U.S. at 701. As rebuttal evidence, Respondents offer ICE statistics on removals to Russia. ECF No. 6 at 9-10. According to those statistics, ICE removed 137 Russian citizens in 2025, 32 of whom were removed from the "Philadelphia Area of Responsibility that is responsible for Mr.  Gavenko's removal." *Id*. at 10.

These statics do not rebut the conclusion that there is no significant likelihood of Petitioner's removal in the reasonably foreseeable future. While it may be true that the number of Russian citizens removed from the United States has increased in recent years—reflecting the cooperation of the Russian government—those statistics say nothing about whether those persons removed to Russia were similarly situated to Petitioner. For example, the statistics do not tell us how many Russian citizens were removed who, like Petitioner, had lived in the United States for more than 30 years and who, like him, had a felony criminal conviction. *See Kacanic v. Elwood*, 2002 WL 31520362, at *4 (E.D. Pa. Nov. 8, 2002) (concluding that "[w]ithout any kind of information that would allow for a meaningful comparison of these

removed aliens to the Petitioner's case, the [statistics showing successful removals to a country do] not give any indication of whether or not the Petitioner will be removed in the near future"). The April 2026 consular notice declining to issue a travel document for Petitioner suggests his circumstances are different. Respondents have thus failed to submit sufficient rebuttal evidence.

In sum, because Petitioner's "removal is not reasonably foreseeable," his "continued detention [is] unreasonable and no longer authorized by statute." *Zadvydas*, 533 U.S. at 699-700. As such, he should be released. In that event, as the Supreme Court emphasized, his "release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances." *Id*. at 700; *see* 8 U.S.C. § 1231(a)(3).

## C. Conclusion

For the foregoing reasons, it is respectfully recommended that the Petition for Writ of Habeas Corpus be granted to the extent that Respondents be directed to release Petitioner forthwith, subject to appropriate conditions in accordance with 8 U.S.C. § 1231(a)(3).

### <u>Notice to the Parties</u>

Pursuant to the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Civil Rules, the parties may, within fourteen (14) days, file objections to this Report and Recommendation. Failure to do so will waive the right to appeal. *Brightwell v. Lehman*, 637 F.3d 187, 193 n.7 (3d Cir. 2011).

Signed on May 27, 2026

_____
Peter E. Ormsby
United States Magistrate Judge